# In the United States Court of Federal Claims

Case No. 04-1544L
(FILED: July 3, 2007)
TO BE PUBLISHED

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * <br><br>**ELLAMAE PHILLIPS CO.**, <br>    *Plaintiff,* <br>v. <br><br>**THE UNITED STATES OF AMERICA**, <br>    *Defendant,* <br><br>* * * * * * * * * * * * * * * * * * * * * * * * * | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | Fifth Amendment taking; Rails-to-Trails Act, 16 U.S.C. § 1247(d); General Railroad Right of Way Act of 1875, 43 U.S.C. §§ 934-939; right-of-way; easement; abandonment; *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005); stare decisis; precedent; dicta. |

    *George M. Allen*, Telluride, Colorado, Counsel of Record for Plaintiff.

    *Sue Ellen Woolridge*, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, *William J. Shapiro*, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice.

    *Richard A. Allen* (Attorney of Record) and *Ralph L. Kissick*, Zuckert, Scoutt, & Rasenberger L.L P., Washington, DC, and *Andrea Ferster*, General Counsel, Rails-to-Trails Conservancy, Washington, DC, filed a brief as Attorneys for Amicus Curiae Rails-to-Trails Conservancy.

    *Arielle Cohen*, law clerk.

## OPINION

**BASKIR**, Judge.

    This is a takings case challenging the conversion of a railroad right-of-way to a biking and hiking trail pursuant to Section 8(d) of the National Trails System Act ("Rails-to-Trails Act") (16 U.S.C. § 1247(d)).  The right-of-way was granted in 1886 across federal public land under the terms of the General Railroad Right of Way Act of 1875 ("1875 Act") (43 U.S.C. §§ 934-939).  The land traversed by the right-of-way was opened to homestead settlement in accordance with the Act of June 11, 1906 (34 Stat. 233).  The property in this litigation was granted in 1914 to Joseph Diemoz, Plaintiff's

predecessor in title. The circumstances surrounding the creation of the right-of-way coincide with those of the "Category 1" plaintiffs in the Federal Circuit's decision in *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005). Indeed, this case was stayed while *Hash* was being reviewed because of the possibility that a Federal Circuit decision might completely moot this matter.

The case is before us on cross motions for summary judgment. After oral argument, held February 16, 2007, we requested supplemental briefing from the Parties on the significance of the conclusion of the Federal Circuit's decision regarding the "Category 1" landowners in *Hash*. Recent decisions by lower courts, including the Court of Federal Claims, have held that the Federal Circuit fully resolved the question of government takings liability in Category 1 cases. We agree. As a matter of stare decisis, we find that the easement across the Plaintiff's land was abandoned and that the conversion to public trail use constitutes a taking. **The Defendant's Motion for Summary Judgment is DENIED and the Plaintiff's Cross Motion is GRANTED.**

## Background

The facts of this case are straightforward and not in dispute. The Plaintiff is the Ellamae Phillips Company, a Colorado Limited Liability Partnership, consisting of three partners, all children of the late Ellamae Phillips. The Plaintiff owns a tract of land in Aspen, Colorado traversed by a railroad corridor known as the Aspen Branch Line. Consolidated Statement of Uncontroverted Facts ("CSUF") ¶ 1.

The land in dispute was originally public land of the United States, part of the Sopris National Forest. CSUF ¶ 5. To promote Westward expansion, Congress passed a number of statutes encouraging the construction of railroads, including the General Railroad Right-of-Way Act of 1875 ("1875 Act") (43 U.S.C. §§ 934-939, repealed in part, Pub.L. 94-579, Title VII § 706(a), 90 Stat. 2793 (1976)). The 1875 Act granted 200 foot wide rights-of-way to railroad companies through the public lands of the United States, together with land for station buildings and rights to take building materials from adjacent land. 43 U.S.C. §§ 934-939.

In order to acquire a right-of-way, a railroad had to file a profile of each section of its road with the Secretary of the Interior and complete construction of the section within five years. 43 U.S.C. § 937. It was anticipated that the public lands underlying the rights-of-way would eventually be transferred to private parties. The 1875 Act provided that "all such lands over which such right of way shall pass shall be disposed of subject to such right of way." *Id.* In sum, the 1875 Act granted to qualifying railroad companies a 200 foot wide passage through public land that would be superior to any private fee estates later created in the same land.

In 1886, the railroad corridor across what would become the Plaintiff's land was granted to the Grand Valley Railway Company under the terms of the 1875 Act. CSUF ¶ 2. Construction of the Aspen Branch Line was completed in 1887. CSUF ¶ 3. In 1910, the Department of Agriculture requested that certain land in the Sopris National Forest be opened to settlement in accordance with the Act of June 11, 1906 (34 Stat. 233). CSUF ¶ 5. On June 1, 1914, Joseph Diemoz submitted an application for "Homestead Entry" with the Department of the Interior for a plot of land. CSUF ¶ 6. The United States issued a patent to the land, which was traversed by the Aspen Branch Line, to Mr. Diemoz on December 21, 1923. CSUF ¶ 7. The Phillips family acquired the land from Mr. Diemoz sometime in the 1920s.

As railroads gave way to automobiles, many railroad corridors were abandoned. Congress passed several laws intended to preserve rail corridors for other transportation uses, culminating with the passage of the National Trails System Act Amendments of 1983, Pub.L. 98-11, 97 Stat. 48, to the National Trails System Act, Pub.L. 90-543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. §§ 1241-1251) ("Rails-to-Trails Act").

The Rails-to-Trails Act authorizes the Interstate Commerce Commission ("ICC") to preserve unused railway rights-of-way for future use by allowing them to be "railbanked" and used as recreational trails. If a State, municipality or private group is willing to assume financial and managerial responsibility for the right-of-way, the railroad must transfer the right-of-way to them for trail use, rather than abandoning the right-of-way. 16 U.S.C. § 1247(d).

Congress asserted in the Rails-to-Trails Act that conversions to trail use that were subject to reactivation of rail service on the route did not constitute abandonment:

> Consistent with the purposes of [the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C.A. § 801 et seq.)], and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, *such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.*

*Id.* (emphasis added).

The railroad right-of-way at issue in this case changed hands several times through acquisitions and mergers. Rail operations on the portion of the line crossing the Phillips property appear to have stopped some time during the 1980s. By 1998,

3

the Roaring Fork Railroad Holding Authority ("RFRHA") owned and operated the right-of-way.  CSUF ¶ 9.  RFRHA is a Colorado inter-governmental entity subject to the jurisdiction of the federal Surface Transportation Board ("STB"), which replaced the ICC as the regulatory body in charge of railroads.

On June 30, 1998, RFRHA filed with the STB the paperwork necessary to convert the right-of-way to a trail pursuant to the Rails-to-Trails Act, including a statement indicating its willingness to assume financial and legal responsibility for the trail.  CSUF ¶¶ 11-13.  On October 15, 1998, the STB issued a Notice of Interim Trail Use ("NITU").  CSUF ¶ 14.  The right-of-way is now being used as a paved bike path.  The Roaring Fork Transportation Authority, created by referendum in 1983, is in the midst of long-term transportation planning for the area which could include resumption of rail service on parts of the right-of-way.  May, 2003 RFTA CIS Study, Pl.'s Supplemental Ex. 35.  The Plaintiff contends that the use of the right-of-way for trail purposes is outside the scope of the 1875 Act and constitutes a taking.  It is unclear whether the Plaintiff also contends that the Rails-to-Trails Act effectuates an abandonment of the right-of-way.

**Discussion**

I.      Standard of Review

This case comes before the Court on cross motions for summary judgment.  The standard for determination is well-known.  Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Rules of the United States Court of Federal Claims ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In making this determination, the Court must resolve all reasonable inferences in favor of the non-moving party.  *Champagne v. United States*, 35 Fed. Cl. 198, 206 (1996).  When, as here, there are cross motions for summary judgment, the Court must evaluate each motion individually, making inferences against the moving party with respect to each motion.  *DeMarini Sports, Inc. v. Worth, Inc.*,  239 F.3d 1314, 1322 (Fed. Cir. 2001).  The existence of *any* factual dispute is not sufficient for a party to survive summary judgment – the dispute of fact must be material to the legal issue.  *Liberty Lobby*, 477 U.S. at 247-48.  There are very few factual disputes in this case.  None are material to the legal question of whether 16 U.S.C. § 1247(d) operates to effect a taking of the Plaintiff's interest in the railroad right-of-way.

II.     Jurisdiction

Jurisdiction in this case is not disputed.  However, the parties may not confer jurisdiction by agreement.  The Court must satisfy itself.  The Tucker Act confers jurisdiction upon the United States Court of Federal Claims over certain suits for money against the United States founded upon the Constitution or other laws, and waives

sovereign immunity. 28 U.S.C. §1491. The substantive right to money from the United States must be found outside the Tucker Act. *See e.g., United States v. Mitchell*, 463 U.S. 206, 216-217 (1983). Constitutional jurisdiction must be based on a money-mandating constitutional provision. *Id.* The takings clause of the Fifth Amendment is such a provision. *See e.g. United States v. Causby* 328 U.S. 256, 267 (1946) ("If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine.")

III.     Discussion

    A.     The *Hash* Cases

*Hash* is a class action of approximately two hundred Idaho landowners who are successors to homesteaders who received land grants under the Homestead Act of 1862 (12 Stat. 392, 43 U.S.C. § 161, repealed, 90 Stat. 2787 (1976)). *Hash v. United States,* No. CV 99-324-S-MHW, 2001 WL 35986188 (D.Idaho Nov. 27, 2001). The *Hash* case has a complicated procedural history. For clarity, we will refer to the 2001 District Court memorandum decision as *Hash I*. We will refer to the Federal Circuit decision, 403 F.3d 1308 (Fed. Cir. 2005) as *Hash II* and the 2007 District Court memorandum decision, No. CV 99-324-S-MHW, 2007 WL 1309548 (D.Idaho Feb. 1, 2007) as *Hash III*. When speaking of the general history of the case, we will use simply *Hash*.

The *Hash* class members' land is traversed by a rail corridor originally operated by the Pacific and Idaho Northern Railroad Company. *Hash I,* 2001 WL 35986188 at *2. The right-of-way for the railroad was acquired piecemeal between 1899 and 1905. *Hash II*, 403 F.3d at 1311. In 1995, the Interstate Commerce Commission ("ICC") authorized the discontinuation of operations on the rail line and conversion of the line to recreational trail use under the Rails-to-Trails Act. *Id.* The plaintiffs asserted that absent the ICC decision and conversion to trail use, the right-of-way segments would have reverted to each of the underlying landowners and the trail conversion therefore constituted a taking. *Hash I,* 2001 WL 35986188 at *2. As in our case, a petition was filed under the Rails-to-Trails Act for conversion of the right-of-way to a trail, subject to reactivation of rail service.

The trial court divided the 192 class members into 14 categories. *Hash I*, 2001 WL 35986188 at *1. Category 1 consisted of twenty-four properties granted under the Homestead Act of 1862 after the railroad had acquired its right-of-way traversing then-public land pursuant to the 1875 Act. *Id.* Those parcels which were already in private hands when the railroad sought its right-of-way were divided into additional categories based on the type and terms of the instrument conveying the right-of-way. *Id*.

5

The particular circumstances of our case coincide with the Category 1 plaintiffs in *Hash*. Like the Category 1 landowners, the Plaintiff's predecessor in title in the instant case obtained land pursuant to a homesteading statute after the railroad had acquired its right-of-way traversing then-public land pursuant to the 1875 Act.

Although the homestead patents were issued pursuant to different statutes, neither statute addresses interaction with railroad rights-of-way. 12 Stat. 392; 34 Stat. 233. Section 4 of the 1875 Act provides the only guidance in both cases. It states that after the railroad right-of-way is filed with the Secretary of the Interior, "all such lands over which such right of way shall pass shall be disposed of subject to such right of way." 43 U.S.C. 937.

In 2001, Magistrate Judge Mikel H. Williams issued a memorandum opinion addressing the first question in *Hash* – identifying the property interests held respectively by the homesteaders, the Railroad and the United States in the various plaintiff categories. *Hash I*, 2001 WL 35986188. Prior Supreme Court decisions already established that the rights-of-way granted under the 1875 Act were easements, not fee simple conveyances. *Great Northern R. Co. v. United States*, 315 U.S. 262, 279 (1942); *United States v. Union Pac. R. Co.*, 353 U.S. 112, 128 (1957). For Category 1, therefore, the railroad did not own the underlying estate.

The court then focused on determining "whether the United States retained a reversionary interest in the subject parcels or if any reversionary interest accompanied the patents and vested in the homesteaders." *Hash I*, 2001 WL 35986188, at *3. If the United States retained ownership of the property underlying the rights-of-way when it released the parcels to homesteaders, then the plaintiffs would have no property interest that could be taken by the conversion to trail use. Such a conclusion would not only bar the takings claims of the Category 1 plaintiffs in *Hash*, but our Plaintiff's claims as well. It was for that reason that this case was stayed pending a Federal Circuit answer.

*Hash I* determined that the United States did retain an interest in the rights-of-way:

> The Court finds that the United States held the reversionary interest in the subject rights-of-way when the ICC issued the notice of interim trail use in 1995. Accordingly, Plaintiffs did not own a vested property interest in any of the 1875 Act rights-of-way at issue when those rights-of-way were railbanked and interim trail use was authorized by the ICC.

*Hash I*, 2001 WL 35986188 at *4.

In 2003, the trial court issued a final judgment order for Category 1 and several other categories of plaintiffs, allowing them to move forward on appeal while determinations were made for the remaining categories. *Hash v. United States,* No. CV99-324-S-MHW 2003 U.S. Dist. LEXIS 26384 (D.Idaho March 7, 2003). In refusing

to stay proceedings in the remaining categories, the court noted the separability of the legal issues being appealed and commented that "whether a party holds a property interest is an entirely different question than whether that property interest has been taken without just compensation. *The Court has yet to decide the latter* and, for those reasons, will deny Class Plaintiffs' motion for stay pending appeal." *Id.* at *15 (emphasis added).

The Court of Appeals for the Federal Circuit reversed the trial court on the question of whether the United States retained an interest in the land underlying the Category 1 rights-of-way. It held that the landowners held the reversionary interest underlying the right-of-way. Although this was the only issue decided in *Hash I*, the only issue appealed and briefed, the Federal Circuit went further. It determined "takings" liability and remanded for calculation of damages. *Hash II*, 403 F.3d 1308. At the conclusion of its discussion of the Category 1 landowners, the Federal Circuit stated:

> We conclude that the land of Category 1 is owned in fee by the landowners, subject to the railway easement. The district court's contrary decision is reversed. *On the railway's abandonment of its right-of-way these owners were disencumbered of the railway easement, and upon conversion of this land to a public trail, these owners' property interests were taken for public use*, in accordance with the principles set forth in the *Preseault* cases. On remand the district court shall determine just compensation on the conditions that apply to these landowners.

*Id.* at 1318 (emphasis added).

### B. Supplemental Briefing

Because the right-of-way across the Phillips property was acquired under the same circumstances as the Category 1 rights-of-way in *Hash*, this case was stayed while *Hash II* was being reviewed because of the possibility that a Federal Circuit decision might completely moot this matter. After the stay was lifted, the Parties filed cross motions for summary judgment. The briefing originally submitted on those motions touched on a number of issues, particularly the scope of the easements created under the 1875 Act, and whether railbanking or interim trail use constituted abandonment of the easement.

Neither Party treated *Hash II* as dispositive of all the liability issues in the case. The Government's position was, and still is, that *Hash II* decided only the "threshold question" of whether the United States retained a reversionary interest in the right-of-way and left open the question of whether or not the easement had terminated through abandonment. Def.'s Br. in Supp. of Mot. for Summ. J. at 12; Def.'s Resp. to Ct.'s March 15, 2007 Order ("Def.'s Supp. Br."). Amicus Rails-to-Trails Conservancy ("RTC") took the same position. RTC's Second Supplemental Br. in Supp. of Def.'s Mot. for Summ. J. at 9. The Plaintiff's briefs largely ignored *Hash II*, focusing instead on

demonstrating the narrow scope of the 1875 Act railroad easement through a lengthy examination of the general history of federal railroad policy and the specific circumstances of the Aspen Branch Line.

It thus appeared that the crux of the case would be a determination of whether the cessation of rail service and the conversion of the right-of-way to trail use would constitute abandonment of the right of way, despite Congress' express language to the contrary in the Rails-to-Trails Act. Alternatively, as Plaintiff's counsel suggested, conversion to trail use (and perhaps rail-banking) might constitute an entirely new easement outside the scope of the original railroad easement. In this alternative, the key issue would be determining the scope of the 1875 Act easements as illuminated by its text and legislative intent.

However, shortly after we held oral argument, the Parties brought to the Court's attention two lower court decisions in which the final paragraph of *Hash II's* discussion of Category 1 was treated as binding precedent on the issue of liability. *Hash II* then took on an entirely new and potentially decisive role in our case, a significance that belied the Parties' earlier dismissive treatment of the case.

Magistrate Judge Williams of the District of Idaho concluded he was bound by the plain language of the Federal Circuit's mandate to hold that a taking had occurred in *Hash*, despite having made no inquiry into the question of abandonment. *Hash III*, 2007 WL 1309548. The court cited *In re Sanford Fork & Tool Co.*, 160 U.S. 247 (1895), as we will, for the binding authority of pertinent appellate direction. For its part, the Government offered no competing interpretation but argued the court should ignore everything in the decision except the Federal Circuit's reversal of the narrower issue of the reversionary interest decided by the lower court.

Similarly, Judge Hewitt of this Court also determined that the Federal Circuit's finding of abandonment in *Hash II* was binding in the case before her, *Blendu v. United States*, 75 Fed. Cl. 543 (2007). *Blendu* involves a landowner along the same rail corridor as the class action plaintiffs in *Hash*, but was brought separately in the Court of Federal Claims, presumably to avoid the $10,000 limit on damages for Tucker Act cases brought in the District Courts. There again, the Government urged that the court had yet to decide the issues underlying liability, effectively arguing as it did before Magistrate Williams – on the same papers – that the court should ignore all but the *Hash II* holding on reversionary interests. Judge Hewitt rejected the Government's argument that *Hash II* was inconsistent with *Preseault*. Judge Hewitt, as did Magistrate Williams and as we do, concluded that the meaning of the concluding paragraph is plain.

In light of these two decisions applying *Hash II*, we asked the Parties for supplemental briefing on the following questions:

> What is the proper reading of the final paragraph of the Federal Circuit's discussion of the Category 1 landowners?

8

> If the paragraph is ambiguous as to the issues of abandonment, scope of the easement and liability under the Takings Clause, what are this Court's options in light of principles of stare decisis and the recent decisions of Magistrate Judge Williams upon remand of the *Hash* case [*Hash III*] and Judge Hewitt in *Blendu v. United States* [75 Fed. Cl. 543]?
>
> If the paragraph is unambiguous as to the issues of abandonment, scope of the easement and liability under the Takings Clause, what are this Court's options in light of principles of stare decisis and the recent decisions of Magistrate Judge Williams and Judge Hewitt?

*Ellamae Phillips Co. v. United States*, March 15, 2007 Order. We also allowed the Rails-to-Trails Conservancy to submit an amicus brief on these issues.

### 1. The Plain Language of *Hash II*

The concluding paragraph of the discussion of Category 1 in *Hash II* clearly asserts that the rights-of-way *were* abandoned. As Judge Hewitt noted in *Blendu*, the third sentence is not, as the Government has urged, written as a contingency or hypothetical. *Blendu,* 75 Fed. Cl. at 548. The first part of the sentence could have been written as a contingency – 'on the railway's abandonment of its right-of-way these owners *would be* disencumbered of the railway easement,' – but it was not. It was written as a declarative sentence in the simple past tense. To paraphrase: "these owners were disencumbered of the railway easement upon the railway's abandonment of its right-of-way." We are unpersuaded by the Government's effort to import ambiguity into what can only be described as the plain meaning of the mandate.

The sentence goes on to decide takings liability, stating that conversion to a public trail resulted in the owners' property being taken for public use, incorporating the takings principles of *Preseault v. Interstate Commerce Commission*, 494 U.S. 1 (1990).

Finally, the last sentence of the paragraph, using Fifth Amendment language, directs the District Court to compute damages for the taking – "On remand the district court shall determine just compensation on the conditions that apply to these landowners." *Hash II*, 403 F.3d at 1318. Reading the concluding paragraph as a whole, Magistrate Judge Williams concluded that this mandate foreclosed any further argument over abandonment or any other liability issue:

> [I]t appears that the Federal Circuit found that based on the *Preseault* cases, the railway abandoned the right-of-way; that upon abandonment, the Category 1 owners were disencumbered of the railway easement; and that conversion of the land to a public trail constituted a taking for which this Court is to determine just compensation. In other words, rather

9

Case 1:04-cv-01544-EGB   Document 77   Filed 07/03/07   Page 10 of 13

than directing this Court to conduct further proceedings in accordance with *Preseault*, the Federal Circuit itself, rightly or wrongly, made the liability determination applying *Preseault*.

*Hash III*, 2007 WL 1309548 at *4.

In addition to its effort to rewrite the Federal Circuit's language, in *Blendu* the Government urged that the Federal Circuit's mention of *Preseault* was intended to trigger further analysis. Because under *Preseault*, "only some rail-to-trail conversions will amount to takings" (494 U.S. at 16), the Government urged the Court to determine whether railbanking and interim trail use purposes fell within the scope of the easements either as originally created or under the 'shifting public use' doctrine. *Blendu,* 75 Fed. Cl. at 548. Judge Hewitt rejected this argument as reworking ground already covered by *Hash II*: "[t]he Court in *Preseault* did not reach the issue of whether a taking occurred, but it did leave open the possibility that some rail-to-trail conversions will amount to takings, and the Federal Court in *Hash II* decided that such was the case with Category 1 lands." *Id.* (internal citations omitted).

Having rejected all the Government's efforts to evade the application of *Hash II*, Judge Hewitt then cited the various precedent- doctrines of law of the case, stare decisis and res judicata and concluded that *Hash II* applied to her case as well:

> Although this particular case has not reached the Federal Circuit, and the Federal Circuit did not remand *Hash II* to this court, the Federal Circuit's decision in *Hash II* is binding on this court. This court's consideration of the merits of the Joint Motion [for Partial Summary Judgment on the Question of Liability] would be tantamount to intermeddling with the mandate of a superior court whose authority is binding.

*Blendu,* 75 Fed. Cl. at 549 (internal citations omitted).

       2.     The Application of *Hash II*

In its supplemental presentation, the Government argues that even if the mandate paragraph in *Hash II* constitutes the Federal Circuit's conclusion regarding abandonment, its effect should be limited to the particular facts presented in *Hash* and in the related case of *Blendu,* which involves the same rail corridor. Def.'s Supp. Br. at 22. The Government states that "[s]ince the Federal Circuit does not discuss those facts in its opinion, it would be error for this Court to assume that the *Hash [II]* decision is binding on the facts presented here." *Id.* The Government, however, does not point to those differing facts which would compel a different result and we are not aware of any.

We find that the Federal Circuit's abbreviated discussion of the facts in *Hash II* compels a conclusion contrary to the Government's position. The only facts recited by the Federal Circuit are that the railroad acquired the right-of-way across public land

pursuant to the 1875 Act, that the land was later transferred to homesteaders subject to the railroad right-of-way, and that the right-of-way was converted to interim trail use under the Rails-to-Trails Act. The operative facts of this case are no different from those recited by the Federal Circuit in *Hash II* or those present in *Blendu*. The inescapable conclusion is that, under *Hash II*, conversion of 1875 Act rights-of-way to trail use constitutes abandonment as a matter of law.

### 3. The Government's Obiter Dicta Arguments

Aside from its strained reading of the plain language of the paragraph and its attempt to limit the decision on unspecified factual distinctions, the Government makes several arguments that essentially boil down to an assertion that the Federal Circuit could not have meant to say what it clearly has said.

As the Government pointed out in its supplemental briefs to this Court and in its briefs requesting rehearing by the Federal Circuit (denied without opinion August 15, 2005), the question of abandonment was neither briefed before nor decided by the lower court in *Hash I*. Def.'s Supp. Br. at 10-11. The lower court characterized the only critical question before it as "whether the United States retained a reversionary interest in the subject parcels or if any reversionary interest accompanied the patents and vested in the homesteaders." *Hash I*, 2001 WL 35986188 at *3. The court concluded only one issue, that the United States had retained a reversionary interest in the rights-of-way, and therefore the plaintiffs did not have a vested property interest in the rights-of-way that could be taken. *Id.* at *4.

The Federal Circuit in *Hash II* seemingly also saw the issue before it as limited to identifying the ownership of the reversionary interest. It opened its discussion of Category 1 in this way:

> The question for the Category 1 landowners is whether, for the segments of rights-of-way granted over public lands in accordance with the 1875 Act, the ownership of the underlying land remained with the United States for lands subsequently patented to settlers under the Homestead Act.

403 F.3d at 1314. The four pages of discussion that follow consider legislative history and precedent to determine whether the homestead grants contained any implied reservation of the lands underlying the rights-of-way. The Federal Circuit concluded that they did not. *Id.* at 1314-1318. Nowhere in that discussion does the court raise the question of whether or not the rights-of-way were abandoned. *Id*. Moreover, nowhere in the opinion are the other liability issues mentioned, much less discussed.

The absence of any predicate to the Federal Circuit's conclusory statement regarding abandonment is troublesome both for the litigants in *Hash* and for courts attempting to apply correctly precedent in other 1875 Act conversions. The Government thoroughly briefed its non sequitur arguments to the Federal Circuit in its petition for rehearing in *Hash II*. The petition was denied.

It is not our place to second guess the intentions of a higher court. The Government itself grudgingly concedes:

> If . . . the Court determines that the Federal Circuit's decision unambiguously intended to announce a new universal rule in a case of first impression, without any analysis – that the United States is liable for an unconstitutional taking in any case involving 1875 Act grants and application of the Trails Act, regardless of any case-specific facts – this Court should apply the doctrine of *stare decisis* and rule in Plaintiff's favor. It is beyond cavil that this Court is bound by precedent of the Supreme Court and the Federal Circuit.

Def.'s Supp. Br. at 22.

We agree with the government in this respect. Stare decisis is fundamental to our judicial system:

> When a case has been once decided by this court on appeal, and remanded to the circuit court, whatever was before this court, and disposed of by its decree, is considered as finally settled. The circuit court is bound by the decree as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.

*In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895). It is not for a trial court to disregard appellate decisions we think wrongly decided or poorly reasoned:

> [T]he Court of Federal Claims may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit any more than the Federal Circuit may deviate from the precedent of the United States Supreme Court. Trial courts are not free to make the law anew simply because they disagree with the precedential and authoritative analysis of a reviewing appellate court.

*Crowley v. United States*, 398 F.3d 1329, 1335 (Fed. Cir. 2005). The discussion of Category 1 and the concluding paragraph in *Hash II* must be read as a determination that conversions of 1875 Act easements to trail use constitute abandonment and give rise to takings liability. Therefore, we must hold the Government liable for a taking of the Plaintiff's property.

**Conclusion**

      For these reasons, we find that conversion of the railroad easement across Plaintiff's land to a recreational and bike trail constitutes abandonment.  By preventing the termination of the otherwise abandoned easement, the operation of 16 U.S.C. § 1247(d) constitutes a taking.   **The Defendant's Motion for Summary Judgment is DENIED and the Plaintiff's Cross Motion is GRANTED.  The parties are ordered to submit a Joint Status Report no later than August 3, 2007, proposing a schedule for further proceedings in this case.**

      IT IS SO ORDERED.

                                          <u>  /s/ Lawrence M. Baskir  </u>
                                            LAWRENCE M. BASKIR
                                                   Judge